IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Kareem Martin, | ) | C/A No. 0:20-1400-MGL-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Sheriff Will Montgomery; Deputy Samantha | ) | **REPORT AND RECOMMENDATION** |
| Demirtas; Sergeant Timothy Inman; Sergeant | ) | |
| Chris Darner; Fairfield County Sheriff's | ) | |
| Office, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Kareem Martin filed this case pursuant to 42 U.S.C. § 1983 and the South Carolina

Tort Claims Act, S.C. Code Ann. §§ 15-78-10 et seq., in the Fairfield County Court of Common

Pleas. The defendants removed the case pursuant to 28 U.S.C. § 1331. This matter is before the

court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and

Recommendation on the parties' cross motions for summary judgment,[1] (ECF Nos. 41 & 66),

which are fully briefed, (ECF Nos. 43, 49, & 73). Having reviewed the record presented and the

applicable law, the court concludes that the defendants' motion be granted and Martin's motion be

denied.

## BACKGROUND

The following facts are either undisputed or are taken in the light most favorable to the

non-moving party, to the extent they find support in the record. This case arises out of the arrest

of Kareem Martin by Fairfield County Sheriff's deputies on the night of February 10, 2018.

---

[1] Martin's motion seeks summary judgment only as to the defendants' liability for his Fourth Amendment claims pursuant to § 1983.

Kareem lived on "family land" on Martin Road in Winnsboro, South Carolina—that is, all of the adjacent lots are owned by Kareem's relatives.[2]  One of those lots is owned by Kareem's grandmother, Minnie Lee Martin, who lives with Kareem's cousin, Jaida Martin, in a house on that property.

On February 10, Jaida called the police to report that someone was sending her harassing and threatening text messages, including a threat to shoot-up Minnie Lee's house.  Fairfield County Sheriff's Deputy Samantha Demirtas drove to Minnie Lee's house, arriving around 6:45 p.m. when it was dark outside.[3]  Deputy Demirtas met Jaida and Minnie Lee in the driveway where she took a report from Jaida about the threatening text messages.  Shortly after Jaida told Deputy Demirtas about the threatening messages, including the threat to shoot up Minnie Lee's house, they heard five gunshots in quick succession coming from behind Minnie Lee's house.  Deputy Demirtas asked Jaida and Minnie Lee whether they knew anything about the gunshots and they responded, "no."  (Def.'s Mot. Summ. J. Ex. B, Demirtas Body Camera Video at 4:29 ("Demirtas Video"), ECF No. 66-3.)  Deputy Demirtas informed dispatch that she heard gunshots, drew her gun and a flashlight, and walked toward the backyard of Minnie Lee's house.

Approaching the rear of the house with her gun drawn, Deputy Demirtas saw two men with guns—Kareem and his cousin Keenan Martin—walking toward the house.  Deputy Demirtas exclaimed, "Is that you firing over there" and ordered Kareem and Keenan to show their hands, drop their weapons, interlace their fingers behind their head, and kneel to the ground.  (Demirtas Video at 5:15.)  Kareem and Keenan complied with those orders while Deputy Demirtas kept her

---

[2] Throughout the record, Kareem is also referred to as Tyrell or Ty, especially by his relatives.

[3] The incident was recorded on body cameras of the responding deputies.

gun and flashlight pointed at them. Deputy Demirtas then asked them what they were shooting at, and one of them responded, "We can't shoot out here? We can't shoot on our property?" (Demirtas Video at 5:44.) Deputy Demirtas then asked who owned the property and one of them responded that it was "my property." (Demirtas Video at 5:53.) Kareem or Keenan asked if it was illegal to shoot and Deputy Demirtas responded that it was illegal to shoot when it was dark. Deputy Demirtas then asked for their names and one of them asked, "Why do you need them?" (Demirtas Video at 6:15.) Deputy Demirtas informed the dispatcher that she had two unidentified black males refusing to give their names. She then asked them again what they were shooting at, and one of them responded "my property." (Demirtas Video at 6:33.) Jaida and Minnie Lee had approached and were observing the situation. Deputy Demirtas handcuffed Kareem and then moved Kareem and Keenan to stand by a nearby pickup truck. Deputy Demirtas then stated that, "Shooting on your property, family's property, is no issue. But when you got a deputy out here trying to do a report, it's dark, common sense. Common sense." (Demirtas Video at 7:31.)

Deputy Demirtas asked Jaida and Minnie Lee if everyone was related. Jaida stated that Kareem and Keenan were her cousins and Minnie Lee stated that Kareem was her grandson and Keenan was her nephew. Deputy Demirtas asked if they knew that Kareem and Keenan were shooting on the property and Jaida said no, but Minnie Lee said yes. Minnie Lee said that they had been shooting earlier in the day and that they just shoot up in the air. Jaida said that they weren't shooting at anyone. Deputy Demirtas asked if they were shooting "straight up in the air," to which Minnie Lee responded yes, and Kareem and Keenan did not say anything. (Demirtas Video at 8:40.) Deputy Demirtas asked if they owned the property, and Minnie Lee stated that where Kareem and Keenan were shooting was Kareem's property. Minnie Lee also stated that Kareem and Keenan did not mean any harm by shooting.

Deputy Demirtas asked Kareem and Keenan if they had identification. Their response is not audible on the video. Deputy Demirtas told them that she was detaining them until she could identify them. Kareem asked why they were being detained and Deputy Demirtas said they would be detained until she could identify them and determine their age. Deputy Demirtas continued to ask for their names and IDs, but Kareem and Keenan stopped responding to her questions. Deputy Demirtas then began walking Kareem and Keenan back to the front of the house and said that she had them on camera discharging weapons in an unsafe manner in the air. Keenan asked "what'd we do," and Deputy Demirtas responded that she had "no issue letting y'all go" in light of their being on their own property, but she just wanted to "run y'all to make sure." (Demirtas Video at 10:36.) When Kareem and Keenan questioned that justification for detaining them, Deputy Demirtas asked, "Where's the weed at?" (Demirtas Video at 10:49.) Keenan declined having weed.

Other deputies including Defendants Inman and Darner had arrived at that point and assisted in handcuffing Keenan when they reached the front of the house. The deputies then separated Kareem and Keenan, eventually placing them in the back of separate patrol cars, each of them handcuffed. Some of the deputies huddled together with Deputy Demirtas to discuss what happened. Deputy Demirtas noted Kareem and Keenan smelled like marijuana, refused to identify themselves, and refused to say at what they were shooting. She further noted that they otherwise complied with her orders. Deputy Demirtas stated that they were still refusing to identify themselves, and one of the deputies responded that they should "book them as John Doe because they won't tell us who they are, if they want to play, we'll play." (Demirtas Video at 16:54.)

For the next several minutes, the deputies argued with Kareem and Keenan about their refusal to identify themselves. For instance, Deputy Demirtas asked Keenan if he "wanted to make

it easier on yourself so that you don't have to go to jail?" (Demirtas Video at 18:31.) Keenan did not respond and Jaida pleaded with Keenan to identify himself. Deputy Demirtas said, "That's the last offer, it's too late, he's going regardless now." (Demirtas Video at 18:35.) Deputies Inman and Darner told Kareem that it was illegal for Kareem to refuse to identify himself to a law enforcement officer who demands to see his identification. They also told Kareem that they had reasonable suspicion to detain him because he discharged a firearm at night and that they wanted to see his identification to ensure that he had the right to possess the firearm. Deputy Inman told Kareem that he would book him in jail as John Doe and he would stay in jail until he decided to give the deputies his name. Kareem then gave Deputy Inman his name and date of birth at Minnie Lee's urging.

Deputy Demirtas also learned Kareem's and Keenan's names and dates of birth from Jaida. Deputy Demirtas gave Kareem and Keenan's information to the dispatcher, who ran their names and determined that they were "clear"—that is, they had no warrants out for their arrest. Deputy Demirtas decided to charge Kareem and Keenan and take them to jail. Minnie Lee asked Deputies Demirtas and Inman why Kareem and Keenan were being arrested. Deputy Inman responded "because she (Deputy Demirtas) has a right to" and, motioning to Kareem, "do you know how he's acting?" (Demirtas Video at 38:38.) Deputy Demirtas responded that Kareem and Keenan were being "unsafe" when they were shooting, noting that it was dark and they refused to identify themselves. (Demirtas Video at 38:41.) Minnie Lee noted that they by then knew Kareem and Keenan's identity, and Deputy Demirtas said that it did not matter because they gave their information thirty minutes after they were asked for it. The deputies booked Kareem and Keenan in jail, officially charging them with breach of peace in violation of South Carolina common law. The charges were ultimately dismissed by a county magistrate in April 2018.

Kareem brings this action pursuant to 42 U.S.C. § 1983 seeking damages against Fairfield County Sheriff Will Montgomery, Deputy Samantha Demirtas, Sergeant Timothy Inman, and Sergeant Chris Darner in their individual capacities for violations of the First, Second, Fourth, and Fourteenth Amendments.  (Pl.'s Am. Compl., ECF No. 10 at 10-12.)  Plaintiff also brings claims of negligence and gross negligence against the Fairfield County Sheriff's Office pursuant to the South Carolina Tort Claims Act, S.C. Code Ann. §§ 15-78-10 et seq.  (Id. at 12-13.)

## DISCUSSION

### A.    Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

**B.**     **Martin's Claims Pursuant to 42 U.S.C. § 1983**

    **1.**     **Sheriff Will Montgomery**

The defendants argue that Sheriff Montgomery was not involved in Martin's arrest, and therefore, he cannot be held liable in his individual capacity pursuant to § 1983. The court agrees.

A legal action under 42 U.S.C. § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). Martin does not dispute that Sheriff Montgomery was not involved in his arrest. Instead, Martin argues that it is the policy of Sheriff Montgomery to arrest any citizen who does not identify himself. However, while such an argument may be relevant to a claim based on *municipal* liability, see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978),[4] to demonstrate that Sheriff Montgomery can be held personally liable, Martin must show that Sheriff Montgomery was personally involved in and caused the deprivation of his rights. See Wright v.

_____

[4] However, the court notes that sheriffs in South Carolina are considered agents of the state, not municipalities. Gulledge v. Smart, 691 F. Supp. 947, 954-55 (D.S.C. 1988) (concluding that sheriffs and deputy sheriffs are agents of the state and cannot be sued in their official capacities), aff'd, 878 F.2d 379 (4th Cir. 1989) (table).

<u>Collins</u>, 766 F.2d 841, 850 (4th Cir. 1985) ("In order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights. The doctrine of *respondeat superior* has no application under this section.' ") (quoting <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 928 (4th Cir. 1977)); <u>see also</u> See <u>Evans v. Chalmers</u>, 703 F.3d 636, 647 (4th Cir. 2012) ("[C]onstitutional torts . . . require a demonstration of both but-for and proximate causation."). No reasonable jury could conclude that Sheriff Montgomery caused or was personally involved in Martin's arrest. Therefore, Sheriff Montgomery is entitled to summary judgment on Martin's federal claims.

### 2. Deputy Samantha Demirtas, Sergeant Timothy Inman, and Sergeant Chris Darner

The defendants argue that the Deputy Samantha Demirtas, Sergeant Timothy Inman, and Sergeant Chris Darner ("the deputies") are entitled to qualified immunity for Martin's Fourth Amendment claim that the deputies arrested him without probable cause. The court agrees.

The Fourth Amendment protects individuals from unreasonable searches and seizures by the government and requires warrants be issued only upon a finding of probable cause. U.S. Const. amend. IV. To establish a § 1983 claim for false arrest in violation of the Fourth Amendment, the plaintiff must show the seizure of his person was unreasonable, *i.e.*, he must show he was arrested without probable cause. <u>See Rogers v. Pendleton</u>, 249 F.3d 279, 294 (4th Cir. 2001) (stating that claims for false arrest "are essentially claims alleging a seizure of the person in violation of the Fourth Amendment"); <u>Street v. Surdyka</u>, 492 F.2d 368, 372-73 (4th Cir. 1974); <u>see also</u> <u>Brown v. Gilmore</u>, 278 F.3d 362, 367 (4th Cir. 2002) (stating that to establish an unreasonable seizure under the Fourth Amendment, the plaintiff must show he was arrested without probable cause). " 'Probable cause,' for Fourth Amendment purposes, means 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution,

in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992) (quoting Michigan v. De Fillippo, 443 U.S. 31, 37 (1979)).

Qualified immunity shields governmental officials performing discretionary functions from liability for damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. Id. at 235, 242.

In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." Parrish v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." Id. (citations and internal quotation marks omitted). Moreover,

> [a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (first alteration added).  In analyzing this prong, a court in this district must first look to case law from the United States Supreme Court, the Court of Appeals for the Fourth Circuit, and the South Carolina Supreme Court, and in the absence of binding authority, the court must next consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority.  Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 543 (4th Cir. 2017).  The "salient question" " 'is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.' "  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

Where a law enforcement officer asserts qualified immunity from a false arrest claim, the court need not determine whether probable cause actually existed; rather, the court must ask, objectively, whether a reasonable officer in the defendant's position would have believed she had probable cause to arrest the plaintiff.  Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir. 1998); see also Sowers v. City of Charlotte, 659 F. App'x 738, 740 (4th Cir. 2016) ("The arresting officer's belief need not be correct or even more likely true than false, so long as it is reasonable.").  The court must define the right at the appropriate level of specificity, and the Supreme Court has cautioned against defining the right at too high a level of generality.  Booker, 855 F.3d at 543 (quoting al-Kidd, 563 U.S. at 742).  Given the fact-specific nature of the probable cause standard under Fourth Amendment law, defining the precise nature of the purported violation is especially important when analyzing qualified immunity in this context, and the United States Supreme Court had stressed the need to identify a case where an officer acting under *similar circumstances* was held to have violated the Fourth Amendment.  District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (quoting White v. Pauly, 137 S. Ct. 548, 552 (2017)); but see al-Kidd, 563 U.S. at 741

(stating a case directly on point is not required).  That is, existing precedent must place the lawfulness of the arrest "beyond debate."  Id. (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).

Moreover, "[w]hen a court addresses qualified immunity in the summary judgment context, it can condense its analysis." Pittman v. Nelms, 87 F.3d 116, 119 (4th Cir. 1996).  The court need not determine directly whether the plaintiff's evidence shows a constitutional violation, because it can combine the two prongs of the qualified immunity inquiry by asking whether "the plaintiff has 'allege[d] the violation of a *clearly established* constitutional right.' " Id. (quoting Siegert v. Gilley, 500 U.S. 226, 231 (1991)) (alteration in original).  If so, the court must then determine whether the defendant knew or should have known that his conduct was illegal.  Id. (citing DiMeglio v. Haines, 45 F.3d 790, 795 (1995)).  The Fourth Circuit has described this inquiry as whether "a reasonable official would understand that what he is doing violates" the Constitution. Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (quoting Saucier, 533 U.S. at 202). "Although the exact conduct at issue need not have been held unlawful for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest."  Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987); Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992)).[5]

Here, the court finds that the deputies are entitled to qualified immunity because the controlling law did not clearly establish that they lacked probable cause to arrest Martin for breach

---

[5] Here, the defendants do not argue that Martin cannot meet the first prong of the qualified immunity analysis.

of peace.[6]  In South Carolina, breach of peace is a common law offense that encompasses a broad range of conduct that defies strict definition and depends on the conduct's time, place, and proximity to others.  State v. Simms, 774 S.E.2d 445, 447 (S.C. 2015).  Generally, breach of peace is defined as "a violation of the public order as amounts to a disturbance of the public tranquility, by act or conduct either directly having this effect, or by inciting or tending to incite such a disturbance of the public tranquility."  Id. (quoting State v. Peer, 466 S.E.2d 375, 379 (S.C. Ct. App. 1996)).  Martin does not identify, and the court is not aware of, any controlling authority establishing that an officer violates the Fourth Amendment by arresting a suspect for breach of peace in similar circumstances.  South Carolina law is silent on whether shooting a gun, otherwise legally, in a residential area at night amounts to breach of peace.  Nor is the court aware of an analogous case.  Martin has failed to cite to any case law from the Supreme Court, the Fourth Circuit, or the South Carolina Supreme Court that establishes that an officer who makes an arrest in similar circumstances violates the Fourth Amendment, especially in light of the fact that Deputy Demirtas was investigating a threatened shooting.  Therefore, Martin fails to point to any controlling authority that would clearly establish that, in the particular situation confronted by the deputies in this case, see Wesby, 138 S. Ct. at 590, the deputies lacked probable cause to arrest Martin for breach of peace.

Martin argues that the deputies lacked probable cause to arrest him for breach of peace because there is no evidence that anyone was disturbed by his shooting.  (ECF No. 73-1 at 19-20.) In support, Martin points to the South Carolina Court of Appeals's decision in In re Jeremiah W.,

---

[6] The court notes that in their motion, the defendants specifically argue they are entitled to qualified immunity because the deputies had probable cause to arrest Martin for obstruction of justice based on his refusal to provide his name.  In light of the court's conclusion that the deputies arguably had probable cause to arrest Martin for breach of peace, the court need not address this argument.

576 S.E.2d 185 (S.C. Ct. App. 2003), aff'd in relevant part, rev'd on other grounds by In re Jeremiah W., 606 S.E.2d 766 (S.C. 2004). There, the Court of Appeals held that the trial court erred in refusing to grant a directed verdict of acquittal on Jeremiah's charge of breach of peace. Id. at 188. Jeremiah, a minor, was arrested in a Florence County apartment complex for being loud, boisterous, and using profanity in public. Id. at 187. The Court of Appeals held that Jeremiah was entitled to a directed verdict because the State failed to present any evidence that Jeremiah's conduct affected any bystanders, stating that "there must be some evidence that Jeremiah's actions/speech caused at least a minimal level of 'nervousness, frustration, anxiety,' anger, or other evidence that the peacefulness of the neighborhood had been breached." Id. at 188 (quoting State v. Peer, 466 S.E.2d at 377).

To the extent Martin argues that In re Jeremiah W. is controlling precedent that places it beyond dispute that the deputies lacked probable cause to arrest Martin for breach of peace, the court disagrees. In re Jeremiah W. addressed whether the State had sufficient evidence to *convict* Jeremiah of breach of peace, not whether the officer lacked probable cause. But more importantly, the behavior for which Jeremiah was arrested—boisterousness and profanity—is not comparable to Martin's conduct—shooting a gun in the dark at night. See Wesby, 138 S. Ct. at 590 (stating courts must not define clearly established law at a high level of generality, especially in the Fourth Amendment context because officers will find it difficult to know how the general standard of probable cause applies in "the precise situation encountered") (quoting Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)).

Therefore, In re Jeremiah W. stands for the proposition that in order to *convict* a person of breach of peace, the State must demonstrate that the defendant's actions disturbed others around the defendant. But here, the court is not concerned with whether the State could have ultimately

convicted Martin of breach of peace. Even assuming In re Jeremiah W. is controlling precedent that puts officers on notice that they lack probable cause to arrest someone for breach of peace if no bystanders are disturbed, the relevant question here is whether a reasonable officer in the deputies' position had reason to believe that Martin's neighbors were disturbed by him shooting a gun at night. Martin correctly points out that the deputies had not received any complaints about Martin's shooting, but the law does not require that the deputies accurately predict whether Martin's neighbors were disturbed by his shooting. The deputies are entitled to qualified immunity even if they mistakenly, but reasonably, believed that Martin's shooting disturbed his neighbors. See Orem v. Gillmore, 813 F. App'x 90, 92 (4th Cir. 2020) ("Qualified immunity applies if there is arguable probable cause, which exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable.") (internal quotations marks and alterations omitted) (quoting Branch v. Gorman, 742 F.3d 1069, 1072 (8th Cir. 2014)), cert. denied, 141 S. Ct. 1386 (2021); Lea v. Kirby, 171 F. Supp. 2d 579, 583 (M.D.N.C. 2001) ("Although an officer must show probable cause to make a warrantless arrest, in determining whether or not an officer is entitled to qualified immunity under Section 1983, the issue is whether arguable probable cause exists."), aff'd in relevant part, dismissed in part, 39 F. App'x 901 (4th Cir. 2002).

At the time of the arrest, the deputies were aware that Martin discharged a firearm at night on property he owned. Because Martin and his cousin refused to answer Deputy Demirtas's questions, the deputies had to rely on Jaida's and Minnie Lee's statements that Martin was shooting "in the air," which the deputies noted was dangerous, especially in a residential area. (Demirtas Video at 14:50.) Though Martin now claims that he was shooting into a wooded hill behind his family's property (ECF No. 73-1 at 3), that information was not available to Deputy Demirtas at

the time. See Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017) (stating the probable cause inquiry turns on the suspect's conduct as known to the officer at the time) (citing Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016)). Therefore, at the time of the arrest, the deputies were aware that Martin had discharged a firearm in the air, at night, and in a residential area. A reasonable officer could conclude, based on that information, that Martin's neighbors would be disturbed by bullets fired into the air at night.

Martin also argues that the deputies charged him with breach of peace as pretext to arrest him for refusing to identify himself and disrespecting the deputies. Martin points to numerous instances of the deputies telling Martin and his cousin that they could avoid going to jail if they would just identify themselves and that it was illegal to refuse to identify themselves, and the fact that the deputies arrested them anyway even after they obtained their identities and cleared their names. Martin argues these facts demonstrate that the breach of peace charge was pretext to arrest him for his refusal to identify himself, which Martin argues is not a crime.[7] However, in determining whether it was clearly established that the deputies had probable cause to arrest Martin, the deputies' subjective intent is irrelevant. See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.") Therefore, whether the deputies intended to arrest Martin for his refusal to provide identification, an objective officer confronted with those circumstances could reasonably believe that she had probable cause to arrest Martin for breach of peace. Consequently, Deputy Samantha

---

[7] Neither party moved for summary judgment as to Martin's related retaliatory arrest claim under the First Amendment. Thus, the court does not address that claim here.

Demirtas, Sergeant Timothy Inman, and Sergeant Chris Darner are entitled to summary judgment as to Martin's Fourth Amendment claim.

### C.    Martin's Claims Pursuant to the SCTCA

The defendants argue that Martin's negligence and gross negligence claims fail as a matter of law because Martin cannot show that the Fairfield County Sheriff's Office owed a duty to him. The court agrees.

To establish a cause of action in negligence in South Carolina, the plaintiff must prove: (1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty.  Bishop v. S.C. Dep't of Mental Health, 502 S.E.2d 78, 82-83 (S.C. 1998) (citing Rickborn v. Liberty Life Ins. Co., 468 S.E.2d 292 (S.C. 1996)).  "The Court must determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff."  Dorrell v. S.C. Dep't of Transp., 605 S.E.2d 12, 15 (S.C. 2004) (citing Steinke v. S.C. Dep't of Labor, Licensing, & Regul., 520 S.E.2d 142, 149 (S.C. 1999)).

Martin argues the Fairfield County Sheriff's Office had a duty to not unlawfully arrest him. (Pl.'s Resp., ECF No. 73-1 at 26.)  However, South Carolina courts have specifically found that law enforcement officers do not owe its citizens a duty of care under the common law[8] to take legal action against them without error.  In Wyatt v. Fowler, 484 S.E.2d 590 (S.C. 1997), Wyatt

---

[8] The defendants also argue that they had no duty to Martin because of South Carolina's "public duty rule," see, e.g., Jensen v. Anderson Cty. Dep't of Soc. Servs., 403 S.E.2d 615, 617 (S.C. 1991), which essentially states that public officials' *statutory* duties do not create a duty of care towards individual members of the general public.  However, as explained in more depth by the court in Murphy v. Fields, C/A No. 3:17-2914-CMC-PJG, 2019 WL 7195889, at *9-10 (D.S.C. Aug. 29, 2019), report and recommendation adopted, 2019 WL 5417735 (D.S.C. Oct. 23, 2019), appeal dismissed, No. 19-2322, 2020 WL 2551049 (4th Cir. May 13, 2020), the public duty rule has no application here because Martin does not allege that the Fairfield County Sheriff's Office owed him a duty created by statute.

sued a sheriff and three deputies because the deputies mistakenly attempted to arrest Wyatt pursuant to an arrest warrant issued for someone else. <u>Wyatt</u>, 484 S.E.2d at 591. The South Carolina Supreme Court was persuaded by case law from other jurisdictions that held "the police owe a duty to the public at large and not to any individual," and stated "the state does not owe its citizens a duty of care to proceed without error when it brings legal action against them." <u>Id.</u> at 592. Consequently, the South Carolina Supreme Court found that Wyatt failed to prove that the deputies' attempt to arrest someone else created a legal duty of care between the sheriff and Wyatt. <u>Id.</u> Other courts applying <u>Wyatt</u> have found that law enforcement officers do not owe a duty of care to arrestees to charge or investigate them without error. <u>See</u> <u>Smith v. Koon</u>, Civil Action No. 3:19-CV-02155-JMC, 2021 WL 1172692, at *14 (D.S.C. Mar. 29, 2021); <u>Smith v. City of Charleston</u>, No. 2:06-CV-00825-DCN, 2007 WL 9735801, at *5 (D.S.C. July 24, 2007).[9] Therefore, Martin cannot show that the Fairfield County Sheriff's Office owed him any duty of care to file charges against him without error. Accordingly, the Fairfield County Sheriff's Office is entitled to judgment as a matter of law as to Martin's negligence and gross negligence claims.

---

[9] This case is distinguishable from others where courts have found law enforcement officers had a duty of care to arrestees once they were detained or in custody. <u>See</u>, <u>e.g.</u>, <u>Newkirk v. Enzor</u>, 240 F. Supp. 3d 426, 438 (D.S.C. 2017) (finding that the officer's decision to initiate a roadside traffic stop of the plaintiff brought the plaintiff under the officer's control and created a special circumstance giving rise to a duty of care owed to the plaintiff); <u>Murphy v. Fields</u>, 2019 WL 7195889, at *9-10 (collecting cases). In those cases, the duty of care was based on law enforcement's assumption of care for the plaintiffs' physical safety, unlike here where Martin attempts to establish a duty based on law enforcement's care in initiating legal process.

## RECOMMENDATION

Based on the foregoing, the court recommends that the defendants' motion for summary judgment (ECF No. 66) be granted and Martin's motion for summary judgment (ECF No. 41) be denied.[10]

August 31, 2021
Columbia, South Carolina

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

---

[10] The parties did not address Martin's § 1983 claims of violations of the First, Second, and Fourteenth Amendments in their motions for summary judgment and supporting memoranda. Therefore, if this Report and Recommendation is adopted, those claims will remain against the deputies.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).