

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| KAREEM MARTIN,<br>     Plaintiff,<br><br>vs.<br><br>SHERIFF WILL MONTGOMERY; DEPUTY SAMANTHA DEMIRTAS; SERGEANT TIMOTHY INMAN; SERGEANT CHRIS DARNER; and FAIRFIELD COUNTY SHERIFF'S OFFICE,<br>     Defendants. | §<br>§<br>§<br>§<br>§<br>§   Civil Action No. 0:20-01400-MGL<br>§<br>§<br>§<br>§<br>§ |

**ORDER ADOPTING IN PART THE REPORT AND RECOMMENDATION, DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND REMANDING FOR CONSIDERATION OF REMAINING FEDERAL CLAIMS**

Plaintiff Kareem Martin (Martin) filed this case pursuant to 42 U.S.C. § 1983 and the South Carolina Tort Claims Act, S.C. Code Ann. §§ 15-78-10 *et seq.* (SCTCA), in the Fairfield County Court of Common Pleas against Sheriff Will Montgomery (Montgomery), Deputy Samantha Demirtas (Demirtas), Sergeant Timothy Inman (Inman), Sergeant Chris Darner (Darner), and the Fairfield County Sheriff's Office (Fairfield) (collectively, Defendants).

Martin's Section 1983 claims seek damages for violations of his First, Second, Fourth, and Fourteenth Amendment rights against Montgomery, Demirtas, Inman, and Darner in their individual capacities. His SCTCA claims seeks damages against Fairfield for negligence and gross negligence. Defendants removed the case under 28 U.S.C. § 1331.

This matter is before the Court for review of the Report and Recommendation (Report) of the United States Magistrate Judge recommending the Court deny Martin's motion for partial summary judgment and grant Defendants' motion for partial summary judgment. Specifically, the Magistrate Judge recommends Martin's Section 1983 claims against Montgomery, his Section 1983 claims pursuant to the Fourth Amendment against Demirtas, Inman, and Darner, and his SCTCA claim against Fairfield, all be dismissed. The Report was made in accordance with 28 U.S.C. § 636 and Local Civil Rule 73.02 for the District of South Carolina.

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The Court is charged with making a de novo determination of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). The Court need not conduct a de novo review, however, "when a party makes general and conclusory objections that do not direct the court to a specific error in the [Magistrate Judge's] proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

The Magistrate Judge filed the Report on August 31, 2021, Martin filed his objections on September 21, 2021, Defendants filed their objection the same day, and Defendants replied, on January 11, 2022, to the Court's text order regarding certain arguments made in Defendants' motion for partial summary judgment. The Court has reviewed the objections, but holds them to be without merit. It will therefore enter judgment accordingly.

This case arises out of the arrest of Martin by Demirtas, Inman, and Darner on the evening of February 10, 2018. Martin lives on Martin Road in Winnsboro, South Carolina, and various

family members own lots surrounding his property. One of those lots is owned by Martin's grandmother, Minnie Lee Martin (Minnie), who allows Martin's cousin, Jaida Martin (Jaida), to reside in her residence.

On February 10, 2018, Jaida called the police to report harassing and threatening text messages she received from certain individuals. According to Jaida, some of the text messages included a threat to shoot-up Minnie's house, with the specific goal of killing Minnie. Demirtas, the responding officer to Jaida's call to the police, arrived at Minnie's house around 6:45 PM, when it was pitch-black dark outside. When Demirtas arrived at Minnie's home, she began taking a statement from Jaida in the driveway. Minnie stood next to Jaida as she provided her statement to Demirtas. And, Demirtas's, Inman's, and Darner's body cameras recorded and captured all the events as set forth herein.

As Jaida provided her statement to Demirtas, the sound of five gunshots, in quick succession, came from behind Minnie's house. Demirtas asked Jaida and Minnie whether they knew about the source of the gunfire, and they responded no. Demirtas then informed dispatch of the gunshots, drew her gun and flashlight, cautiously walked toward the source of the gunfire behind Minnie's home, entered Minnie's backyard, and noticed two male individuals with guns: Martin and his cousin Keenan Martin (Keenan), who were standing in a lot behind Minnie's backyard.

Demirtas asked Martin and Keenen whether they were firing a weapon and ordered them to show their hands, drop their guns, interlace their fingers behind their heads, and kneel on the ground. Martin and Keenan complied with Demirtas's orders without incident.

Demirtas asked them what they were shooting at, and Martin responded he was shooting on his property. Martin proceeded to ask whether shooting on his property was an illegal act, and

3

Demirtas responded shooting on one's land after dark, when an officer was attempting to take a statement from someone in close proximity, such as Jaida, was illegal.

Demirtas asked Martin and Keenan to provide their names, but they refused. Demirtas handcuffed Martin and moved him and Keenan to stand beside a nearby vehicle. Jaida and Minnie approached, and Demirtas asked if Martin and Keenan were related to them. Jaida told Demirtas that Martin and Kennan were her cousins, and Minnie opined Martin was her grandson and Keenan was her nephew.

Demirtas asked whether Jaida and Minnie knew Martin and Keenan were shooting on the property behind Minnie's home. Jaida responded no, but Minnie answered yes. According to Minnie, Martin and Keenan had been shooting into the air earlier in the day. Minnie also expressed to Demirtas they were shooting on property owned by Martin.

Demirtas asked Martin and Keenan for identification, and indicated to them she was detaining them until they could be identified. Martin asked the justification for their detention, and Demirtas stated she needed to verify their identity and ascertain their age. Demirtas walked Martin and Keenan back to the front of Minnie's house, at which time Inman and Darner arrived and assisted in the handcuffing of Keenan. The deputies proceeded to ask Martin and Keenan to identify themselves, but they refused.

Inman and Darner told Martin it was illegal to refuse to identify oneself to a law enforcement officer who requires to see his identification. They further informed Martin they had reasonable suspicion to detain him because he discharged a firearm at night and they wanted to see his identification to confirm he had the legal authority to possess a firearm. Martin, at Minnie's urging, provided Inman his name and date of birth. Jaida also provided Martin and Kennan's names and dates of birth to Demirtas.

4

Demirtas revealed to Martin and Kennan she was taking them to jail. Minnie asked Demirtas why she was taking them to jail, and Demirtas responded they were being unsafe when they discharged a firearm in the dark and refused to identify themselves. Martin and Keenan were officially charged with breach of peace in violation of South Carolina common law.

As noted above, Martin brought this action under 42 U.S.C. § 1983 seeking damages against Montgomery, Demirtas, Inman, and Darner, in their individual capacities, for violations of his First, Second, Fourth, and Fourteenth Amendment rights. Martin also brought claims of negligence and gross negligence against Fairfield pursuant to the SCTCA.

Both parties object to the Report, and the Court will address Martin's objections first. Although Martin lists numerous objections to the Report, a number of them consist of alleged factual clarifications that fail to direct the Court to a specific error in the Report. *See e.g.,* Martin's Obj. at 5, Number VII (noting the Magistrate Judge incorrectly used the word "decline" as opposed to "denied" when citing to a conversation captured on Demirtas's body camera). After reviewing Martin's objections that direct the Court to a specific error in the Magistrate Judge's Report, it identifies three.

As to the first, Martin objects to the Magistrate Judge's determination Demirtas, Inman, and Darner "are entitled to qualified immunity [for Martin's Fourth Amendment claim against them] because the controlling law did not clearly establish that they lacked probable cause to arrest Martin for breach of peace." Report at 11–12 (footnote omitted).

Qualified immunity shields "[g]overnmental officials . . . from liability for money damages so long as their conduct does not violate clearly established statutory or [C]onstitutional rights of which a reasonable person would have known." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th

Cir. 1992). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.*

Determining whether a government official is entitled to qualified immunity generally requires a two-step inquiry. *Pearson v. Callahan*, 555 U.S. 223 (2009). In particular, courts considering whether to dismiss a complaint based on qualified immunity should consider both "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a [C]onstitutional right" and "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* at 232 (citations omitted).

"When a court addresses qualified immunity in the summary judgment context, it can condense its analysis." *Pittman v. Nelms*, 87 F.3d 116, 119 (4th Cir. 1996). A court need not ascertain whether plaintiff's evidence shows a Constitutional violation, because it may combine the two prongs of the qualified immunity inquiry "by asking whether the plaintiff has 'allege[d] the violation of a *clearly established* constitutional right.'" *Id.* (quoting *Siegert v. Gilley*, 500 U.S. 226, 231 (1991)). "If the answer is affirmative, the court must determine whether the defendant 'knew or should have known' that his conduct was illegal." *Id.* (quoting *DiMeglio v. Haines*, 45 F.3d 790, 795 (1995)).

The Fourth Circuit describes this inquiry as whether "a reasonable official would understand that what he is doing violates" the Constitution. *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (internal citation omitted). "Although the exact conduct at issue need not have been held unlawful . . . for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Id.* "A determination that a right is clearly established may be based on controlling authority in the jurisdiction in question or on a 'consensus of cases of persuasive authority such that a reasonable

officer could not have believed that his actions were lawful.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

"A breach of the peace is a common law offense." *State v. Simms*, 774 S.E.2d 445, 447 (S.C. 2015). "The term 'breach of the peace' is a generic one embracing a great variety of conduct destroying or menacing public order and tranquility." *State v. Peer*, 466 S.E.2d 375, 379 (S.C. Ct. App. 1996). "In general terms, it is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence." *Id.* "Although it includes acts likely to produce violence in others, actual violence is not an element of breach of peace." *Id.* "Whether conduct constitutes a breach of the peace depends on the time, place, and nearness of other persons." *Id.* And, "[t]he right of a person to use his own property does not entitle him to violate the peace and comfort of others in the vicinity." *Id.*

Here, as noted by the Magistrate Judge, "Martin does not identify, and the [C]ourt is not aware of, any controlling authority establishing that an officer violates the Fourth Amendment by arresting a suspect for breach of peace [under] similar circumstances." Report at 12. South Carolina law fails to speak on the issue of whether shooting a firearm into the air in a residential area during the nighttime amounts to a breach of peace. Hence, as "Martin has failed to cite to any case law from the Supreme Court, the Fourth Circuit, or the South Carolina Supreme Court that establishes that an officer who makes an arrest in similar circumstances violates the Fourth Amendment, especially in light of the fact that [Demirtas] was investigating a threatened shooting [as complained of by Jaida while standing in Minnie's driveway,]" *id.*, Demirtas, Inman, and Darner are entitled to qualified immunity on Martin's Fourth Amendment claim.

Furthermore, Martin, in his objection, reiterates his contention Demirtas, Inman, and Darner charged him with breach of peace as a pretext to arresting him for refusing to identify

7

himself and disrespecting them. This argument is meritless and contrary to well-established caselaw on the arresting officer's state of mind.

As is relevant to this contention by Martin, "[o]ur cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). "That is to say, [an officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* "[T]he fact that the officer does not have the state of mind which is hypothetical by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978).

Thus, as the Magistrate Judge correctly noted, "in determining whether it was clearly established that the deputies had probable cause to arrest Martin, [their] subjective intent is irrelevant." Report at 15. Consequently, this objection will be overruled.

Next, Martin objects to the Magistrate Judge's recommendation the Section 1983 claims against Montgomery must be dismissed. According to Martin, he "is not alleging supervisory liability [against Montgomery] under respondeat superior[,]" Obj. at 5 (emphasis modified), but is doing so under a supervisory liability theory. Thus, according to Martin, although Montgomery was not directly involved in his arrest, he is liable under Section 1983 in a supervisory capacity for the actions of his subordinates.

Although neither party discussed Section 1983 supervisory liability in their briefing before the Magistrate Judge, inasmuch as Defendants' arguments in their partial motion for summary judgment focused on Martin's Fourth Amendment claim, the Court, in this Order, will address only whether Montgomery may be held liable in a supervisory capacity pursuant to Section 1983

for that specific claim. The parties, if they so choose, may address Montgomery's potential supervisory liability under Section 1983 for all other federal Constitutional claims in further briefing before the Magistrate Judge as set forth at the end of this Order.

Although the doctrine of respondeat superior is inapplicable in Section 1983 actions, *see Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . [Section] 1983 suits, . . . a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"), "supervisory officials may be held liable in certain circumstances for federal Constitutional injuries inflicted by their subordinates[,]" *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

To establish supervisory liability under Section 1983, a plaintiff must show: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of [C]onstitutional injury to citizens like the plaintiff"; "(2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to[,] or tacit authorization of[,] the alleged offensive practices"; and "(3) that there was an affirmative causal link between the supervisor's inaction and the particular [C]onstitutional injury suffered by the plaintiff." *Id.* at 799 (internal citations omitted).

"To satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of [C]onstitutional injury to the plaintiff." *Id.* "Establishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of [C]onstitutional injury." *Id.* (internal citation omitted) (footnote omitted).

9

Here, as noted above in the Court's detailed qualified immunity analysis, Montgomery's subordinates, Demirtas, Inman, and Darner, charged Martin with breach of peace for his act of shooting a firearm, into the air, in a residential area, during the nighttime.  As to the first *Stroud* element, Martin is unable to demonstrate Montgomery's subordinates, Demirtas, Inman, and Darner, engaged in conduct that "pose[d] a pervasive and unreasonable risk of [C]onstitutional injury [to him]." *Id*. at 799.  Arresting an individual for breach of peace when he shoots a firearm, into the air, in a residential area, during the nighttime, fails to pose an unreasonable risk of Constitutional harm.  Accordingly, inasmuch as Martin fails to meet the first *Stroud* element, his claim for supervisory liability against Montgomery as to his Fourth Amendment claim fails, and this objection will be overruled as well.

Lastly, Martin objects to the Magistrate Judge's recommendation his negligence and gross negligence claims under the SCTCA be dismissed.

"To establish a cause of action in negligence[,] the following three essential elements must be proven: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *Rickborn v. Liberty Life Ins. Co.*, 468 S.E.2d 292, 298 (S.C. 1996).  "The court must determine, as a matter of law, whether the law recognizes a particular duty."  *Steinke v. S.C. Dept. of Labor, Licensing and Regulation*, 520 S.E.2d 142, 149 (S.C. 1999).  "A plaintiff alleging negligence on the part of a governmental actor or entity may rely either upon a duty created by statute or one founded on the common law."  *Edwards v. Lexington Cnty. Sheriff's Dept.*, 688 S.E.2d 125, 128 (S.C. 2010).

Here, as no statutory duty is invoked by Martin, his negligence claims must rest on a common law duty.  The South Carolina Supreme Court has opined "the police owe a duty to the

public at large and not to any individual." *Wyatt v. Fowler*, 484 S.E.2d 590, 592 (S.C. 1997). "More specifically, the state does not owe its citizens a duty of care to proceed without error when it brings legal action against them." *Id.*

Martin, in his objection, fails to cite to a common law duty owed to him and instead references a South Carolina Supreme Court case that involves a claim for false arrest. But, Martin failed to allege a claim for false arrest in his amended complaint. *See* Am. Compl. p. 12 (categorizing his SCTCA claim as "Negligence and Gross Negligence"). As to the negligence claims in Martin's complaint, he pled duty, breach, causation, and damages. *Id.* ¶¶ 67–69; *see also* Martin Resp. in Opp'n to Defs.' Mot. for Partial Summ. J. at 26 ("The evidence shows [Fairfield] failed to show slight care in its duty to refrain from unlawfully detaining [Martin] . . . , [and Fairfield] had a duty not to unlawfully arrest him."). Consequently, inasmuch as Martin has failed to cite to a common law duty owed to him, his negligence and gross negligence claims fail as a matter of law.

Alternatively, even if the Court construed Martin's state law claims as alleging false arrest, that claim would fail as well. "False arrest in South Carolina is also known as false imprisonment." *Carter v. Byrant*, 838 S.E.2d 523, 527 (S.C. Ct. App. 2020). To prevail in a false imprisonment claim in South Carolina, a plaintiff must prove "(1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful." *Law v. South Carolina Dep't of Corrections*, 629 S.E.2d 642, 651 (S.C. 2006).

Here, Martin's would-be false imprisonment claim turns on the third element of the tort, whether the restraint was unlawful. As discussed above, arresting an individual for breach of the peace when he fires bullets into the air in a residential area during the nighttime is not an unlawful

11

act. Hence, a false imprisonment claim fails as well. Accordingly, for the above reasons, this objection will be overruled, too.

Defendants, in their objection, aver the Magistrate Judge failed to consider Demirtas, Inman, and Darner's arguments for summary judgment as to Martin's Section 1983 claims for violations of his First, Second, and Fourteenth Amendment rights. The Court declines to address those Section 1983 claims here, but, out of an abundance of caution, it directs the parties to file, if they so choose, motions for summary judgment as to those claims within thirty days of this Order for adjudication by the Magistrate Judge. Consequently, Defendants' objection will be overruled.

After a thorough review of the Report and the record in this case pursuant to the standard set forth above, the Court adopts in part the Report, **REMANDS** the matter to the Magistrate Judge for consideration of all remaining federal Constitutional claims, and incorporates it herein. Therefore, it is the judgment of the Court Martin's partial motion for summary judgment is **DENIED**, and Defendants' partial motion for summary judgment is **GRANTED** as to: Martin's Section 1983 claim against Montgomery with respect to his Fourth Amendment claim; his Section 1983 claim pursuant to the Fourth Amendment against Demirtas, Inman, and Darner; and, his negligence and gross negligence claims against Fairfield.

All other claims remain pending, and the parties, if they so choose, may file motions for summary judgment as to the remaining federal Constitutional claims no later than thirty (30) days following this Order. Thus, the Clerk of Court is directed to refer any motions for summary judgment by the parties to the Magistrate Judge in this case.

**IT IS SO ORDERED**.

Signed this 1st day of March 2022, in Columbia, South Carolina.

                                              s/ Mary Geiger Lewis
                                              MARY GEIGER LEWIS
                                              UNITED STATES DISTRICT JUDGE